FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 09, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

PADEN S.,[1]

              Plaintiff,

    v.

MARTIN O'MALLEY, Commissioner of Social Security,[2]

            Defendant.

No.    2:23-cv-00302-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS**

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted for Kilolo Kijakazi as the defendant.

Due to degenerative disc disease, fibromyalgia, asthma, obesity, ankylosing spondylitis, generalized anxiety disorder, major depressive disorder, and gout, Plaintiff Paden S. claims she is unable to work fulltime and applied for disability insurance benefits.  She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly assessed Plaintiff's credibility, mischaracterized evidence regarding physical impairments and the treatment and medication used to control it, and failed to consider the third-party statements of her husband. As is explained below, the ALJ erred considering Plaintiff's credibility, failing to develop the record as to Plaintiff's ankylosing spondylitis, and failing to properly consider the side effects and efficacy of narcotic medication used to treat Plaintiff's condition. This matter is remanded for further proceedings.

## I.    Background

In January 2020, Plaintiff filed application for benefits under Title 2, claiming disability beginning January 11, 2020, based on the physical and mental impairments noted above.[3]

After the agency denied Plaintiff benefits, ALJ Lori Freund held a telephone hearing in May 2022 at which Plaintiff appeared with her representative.[4] Plaintiff

---

[3] AR 372, 404.

[4] AR 85-117.

and a medical expert testified.[5] In December 2022, ALJ Freund held a supplemental hearing at which Plaintiff appeared with her attorney.[6] Plaintiff and a vocational expert testified.[7]

After the hearing, the ALJ issued a decision denying benefits.[8] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[9] As to medical opinions, the ALJ found:

- The opinions of medical advisor Megan Bower, MD, partially persuasive because she did not have the opportunity to review later evidence which showed greater limitation.

- The opinions of state agency evaluator Merry Alto, MD, to be unpersuasive because she did not have the opportunity to review later evidence which showed greater limitation.

- The opinions of state agency evaluator Normal Stanley, MD, to be unpersuasive because he did not have the opportunity to review later evidence which showed greater limitation .

---

[5] *Id.*

[6] AR 118-160.

[7] *Id.*

[8] AR 14-39.  Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[9] AR 16-18.

- The opinions of state agency psychologist Michael Brown, PhD, to be somewhat persuasive that Plaintiff's disorders are severe, but otherwise generally unpersuasive.

- The opinions of state agency evaluator Lisa Hacker, MD, to be generally unpersuasive.[10]

The ALJ also found the third-party statement of Plaintiff's spouse, Jason Schill, to be unpersuasive.[11]

As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through June 30, 2020.

- Step one: Plaintiff had not engaged in substantial gainful activity since January 11, 2020, the alleged onset date through her date last insured of June 30, 2020.

- Step two: Plaintiff had the following medically determinable severe impairments: degenerative disc disease of the cervical spine, fibromyalgia, asthma, obesity, ankylosing spondylitis, generalized anxiety disorder, and major depressive disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

---

[10] AR 28-29.

[11] AR 29-30.

- RFC:  Plaintiff had the RFC to perform a full range of sedentary work with the following exceptions:

  [Plaintiff] should never climb ladders, ropes, or scaffolds, and should never crawl. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. She can reach overhead with the bilateral arms occasionally and can reach in all other directions with the bilateral arms frequently. She can push and pull with the bilateral upper extremities frequently. She should avoid all exposure to unprotected heights, working around hazards, and hazardous machinery. She should avoid concentrated exposure to extreme cold, extreme heat, excessive industrial vibrations, airborne particulates such as fumes, odors, dusts, gasses. The claimant is able to perform simple and repetitive tasks and can tolerate occasional changes in the work setting.

- Step four: Plaintiff is unable to perform past relevant work of an hairstylist, sales cashier, and telephone solicitor.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a document preparer (DOT # 249.587-018), a sub-assembler (DOT # 729.684-054), and a marker (DOT # 209.587-034).[12]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[13]

---

[12] AR 20-31.

[13] AR 365.

## II.     Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[14] and such error impacted the nondisability determination.[15] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[16]

---

[14] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. §§ 405(g), 1383(g).

[15] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. §§ 404.1520(a), 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[16] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    Analysis

Plaintiff seeks relief from the denial of disability on two grounds. She argues the ALJ erred when evaluating Plaintiff's subjective complaints and when evaluating the supporting third-party statements of her husband. To the extent that Plaintiff argues that the ALJ mischaracterized or misunderstood the effects of Plaintiff's later diagnosed physical impairments, the Court finds her argument to raise the claim that the record was not fully developed.  The Commissioner argues that the RFC for a reduced range of sedentary work formulated by the ALJ adequately accounted for Plaintiff's limitations.[17]  The Court disagrees with the Commissioner. As is explained below, the ALJ's analysis contains consequential error.

### A.    Development of the Record

The Court notes initially that subsequent to the first hearing in the matter, Plaintiff was formally diagnosed with ankylosing spondylitis.  The ALJ found that impairment to be a severe impairment.[18] The ALJ also acknowledged in her decision that the condition resulted in greater limitations than those assessed by all medical sources who had rendered an opinion regarding Plaintiff's physical impairments.[19]

---

[17] ECF No. 12.

[18] AR 20.

[19] AR 28-29.

DISPOSITIVE ORDER - 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1.    <u>Standard</u>

"The ALJ always has a special duty to fully and fairly develop the record" to make a fair determination as to disability, even where, as here, "the claimant is represented by counsel."[20] This "affirmative responsibility to develop the record" is necessary to ensure that the ALJ's decision is based on substantial evidence.[21]

2.    <u>Dr. Bower's Testimony</u>

On May 19, 2022, Megan Bower, MD, appeared and testified before ALJ Lori Freund.[22] She confirmed that her resume was accurate, that she had no prior communications with Plaintiff or the ALJ regarding the case, and that she understood that she was to testify as an impartial expert.[23] Dr. Bower confirmed that she had reviewed the medical records from 1F to 19F.[24]  She said that based on her review of the record Plaintiff suffered from the following impairments: fibromyalgia, nerve impingement in the neck, lesions of the brain, fatigue/muscle weakness, overactive nerves, and chronic pain.[25]  Dr. Bower stated that she considered the special guidelines for fibromyalgia when assessing Plaintiff's

---

[20] *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (cleaned up).

[21] *Id.* at 1184.

[22] AR 85-117.

[23] AR 93-94.

[24] AR 94.

[25] *Id.*

fibromyalgia, considered Listing 1.15 when assessing the nerve impingement in Plaintiff's neck, considered Listing 11.00 when assessing Plaintiff's brain lesion, and considered that a provider opined that Plaintiff was possibly seeking "secondary gain."[26]

Dr. Bower noted that Plaintiff might have a somatoform disorder.[27] She noted that an MRI of the lumbar spine was normal, and that a brain lesion was documented with an MRI of the brain which showed a small T2 Flair that remained stable over multiple brain MRI's.[28] She noted that a diagnosis of fibromyalgia was made considering positive trigger points in the neck, lower back, buttocks, and extremities.[29] She noted that in August 2021 a nerve conduction test was normal. [30] Dr. Bower stated that she considered that Plaintiff refused injections in her back, and that Plaintiff's neurologist opined that she did not have multiple sclerosis based on normal cerebral fluid.[31]  Dr. Bower stated that she did

---

[26] *Id.*

[27] AR 95.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] AR 96.

not think the brain lesions were a severe issue and that Plaintiff's severe

impairment was fibromyalgia.[32]

Dr. Bower opined that due to the effects of her fibromyalgia Plaintiff would

be limited to lifting and carrying ten pounds frequently and twenty pounds

occasionally; standing or walking for three hours at a time and for four-and-a-half

hours in day; sitting a total of seven hours; bilateral overhead reaching

occasionally; and occasionally reaching in front of her bilaterally.[33]  She further

opined that Plaintiff could continuously handle and finger; could frequently push

and pull; could frequently climb ramps and stairs; could climb ladders and scaffolds

occasionally; could frequently balance, stoop, kneel, crouch and crawl; could not be

exposed to unprotected heights; could frequently be exposed to odors, dusts and

fumes; could frequently be exposed to extreme heat, cold or vibration; and could

perform all of her activities of daily living.[34] Dr. Bower opined that these

limitations had been in place since the onset date of June 11, 2020.[35]  She also

opined that Plaintiff's obesity would cause no limitation either on its or in

combination with fibromyalgia.[36]

---

[32] *Id.*

[33] AR 97.

[34] *Id.*

[35] AR 97-98.

[36] AR 98.

Dr. Bower opined that the degenerative changes to Plaintiff's cervical spine would have no limitations because there was no nerve impingement.[37]  She said that she reviewed Exhibit 1F to 19F and did not review any other exhibits.[38] She stated that there was a psychological component to pain but that she had been called to testify only as to physical diagnoses.[39] Dr. Bower said that she was aware from the file that there was a question as to whether Plaintiff had ankylosing spondylitis but she said that it had not been diagnosed and that there had not been a positive test for HLA-B27, which was necessary to diagnosis it.[40] Dr. Bower refused to consider ankylosing spondylitis or answer questions regarding it because it had not been formally diagnosed by a rheumatologist.[41]

On June 10, 2022, Dr. Bower responded to Medical Interrogatories.[42] Dr. Bower identified that Plaintiff's sole impairment remained fibromyalgia and that her limitations remained as detailed at hearing on May 19, 2022.[43]

3.    Relevant Medical Records

---

[37] AR 98-99.

[38] AR 99.

[39] Id.

[40] AR 100.

[41] Id.

[42] AR 1068-1070.

[43] AR 1068, 1070.

As noted, at the time of the hearing, Dr. Bower reviewed Exhibits 1F through 19F.  The record then indicates that four additional exhibits 20F through 24F were admitted into evidence prior to the admission of medical interrogatories submitted by Dr. Bower.  Subsequently, an additional eight exhibits were admitted into evidence at 25F through 33F.  The additional medical evidence admitted amounted to 298 pages of medical records.  For purposes of this argument, the Court summarizes only this later submitted evidence.

On February 23, 2022, Plaintiff presented rheumatologist Elise McVeigh, DO of the Kootenai Rheumatology Clinic with concerns regarding ankylosing spondylitis.[44] Her hip was "very tender," she had buttock pain, her pain had initially been left sided but moved to her right, and it was worse with inactivity and in the evening.[45] An HLA-B27 test was positive on confirmatory testing.[46]  A brain MRI taken January 8, 2020, showed a small but stable T2/FLIAR hyperintense focus in the lateral subependymal left occipital horn, but was otherwise normal.[47] An MRI of the cervical spine taken January 8, 2020, showed mild to moderate right uncovertebral hypertrophy and mild right facet arthropathy resulting in mild right foraminal stenosis at C3-4; and at C5-6 mild to moderate

---

[44] AR 1123.

[45] *Id.*

[46] AR 1124.

[47] *Id.*

1  left and mild right uncovertebral hypertrophy and minimal left foraminal

2  stenosis.[48]

3       Lab results from an HLA-B27 test performed on February 25, 2022, confirmed

4  that Plaintiff was positive for HLA-B27.[49]

5       On March 15, 2022, Plaintiff presented to LMHC Mark Stenzel, reporting a

6  recent flare-up of her fibromyalgia and stating that a rheumatologist had recently

7  identified and diagnosed her illness.[50] On examination Plaintiff was oriented with

8  appropriate affect and euthymic mood, but reported feeling overwhelmed about her

9  medical condition.[51]

10      On March 25, 2022, Plaintiff presented to Fahad Younas, MD, for a

11  cardiology consultation.[52]  Plaintiff complained of lightheadedness, palpitations

12  and pre-syncope of five years with worsening symptoms.[53]  Plaintiff complained of

13  fatigue and change in activity level.[54]

14

15

16  [48] *Id.*

17  [49] AR 1142.

18  [50] AR 1057.

19  [51] *Id.*

20  [52] AR 1087.

21  [53] *Id.*

22  [54] *Id.*

23

On March 29, 2022, Plaintiff presented to LMHC Mark Stenzel with suicidal ideation.[55] Plaintiff complained that two pain management facilities had advised her that her pain was in her head and that they could not help her.[56] Plaintiff advised that her fibromyalgia was painful and caused by stress.[57]

On March 31, 2022, Plaintiff presented to rheumatologist Elise McVeigh, DO for evaluation of ankylosing spondylitis of the lumbosacral region.[58] Dr. McVeigh diagnosed Plaintiff with non-radiographic ankylosing spondylitis of the lumbosacral region and high risk medication use.[59] She noted that HLA-B27+ and that Plaintiff met the criteria for axial spondylarthritis.[60] Dr. McVeigh noted that Plaintiff had failed multiple NSAIDS and would be started on TNF therapy but needed to receive vaccines before staring therapy.[61] Dr. McVeigh noted that Plaintiff's fibromyalgia manifested as widespread pain, arthralgias , fatigue, insomnia, non-restorative sleep, and brain-fog.[62]

---

[55] AR 1055.

[56] *Id.*

[57] *Id.*

[58] AR 1026.

[59] AR 1028, 1029.

[60] AR 1028.

[61] *Id.*

[62] *Id.*

1      On April 22, 2022, an MRI of the pelvis was within normal limits.[63]

2      On May 18, 2022, Plaintiff was seen in her OB-GYN's office by Kate Statz,

3    DO, and was noted to have abdominal pian, back pain, myalgias, depression,

4    nervousness/anxiety, and insomnia.[64]

5      On May 27, 2022, Plaintiff presented to Christian Garrido, PA of Pinnacle

6    Pain Center.[65] PA Garrido noted prescriptions for hydrocodone-acetaminophen,

7    Vistaril, vitamin D,  a lidocaine patch, cyclobenzaprine, Narcan to be used if

8    needed, and escitalopram.[66] PA Garrido noted a diagnosis of ankylosing spondylitis

9    of the cervicothoracic region, ankylosing spondylosis of the lumbar region, and

10   chronic pain syndrome.[67]  PA Garrido noted the need for Narcan due to risk of

11   accidental overdose and noted that he would continuously look for an end strategy

12   to Plaintiff's opiate use.[68]

13     On June 3, 2022, Plaintiff presented to Lisa Matelich, MD, to establish

14   care.[69] Dr. Matelich noted a recent diagnosis of ankylosing spondylitis, and that

15

16   _____

     [63] AR 1097-1098.

17   [64] AR 1099-1100.

18   [65] AR 1071-1080.

19   [66] AR 1073.

20   [67] AR 1075-1077.

21   [68] AR 1075.

22   [69] AR 1166.

23

                                                      DISPOSITIVE ORDER - 15

Plaintiff would soon undergo a hysterectomy.[70] Dr. Matelcih noted an assessment of fibromyalgia affecting multiple sites and that Plaintiff had a lost history of failed medications including gabapentin, SSRI's and supplements; had previously had consultations with a physiatrist without improvement; was currently treating with a pain specialist and taking hydrocodone, a Butrans patch and a lidocaine patch; was in physical therapy; and would start pool therapy.[71] Dr. Matelich also noted ankylosing spondylitis treated by a rheumatologist with diclofenac and a plan to begin Remicade treatment after her hysterectomy.[72] Additionally, Dr. Matelcih noted idiopathic chronic gout of multiple sites which was not acutely inflamed and was treated with allopurinol, as well as moderate depression and generalized anxiety disorder.[73]

A transthoracic echocardiogram performed on June 14, 2022, indicated normal valve structures and function; normal left ventricular size and ejection fraction with mild concentric left ventricular hypertrophy; normal right ventricular size and systolic function; normal estimated right ventricular systolic pressure; and no prior image for comparison.[74]

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] AR 1166-67.

[74] AR 1103-04.

On July 15, 2022, Plaintiff presented to Nathanial Lilya, DO, in the ER of Newport Hospital with acute bilateral low back pain radiating into her legs.[75] Plaintiff reported prior surgery for a herniated disc at L5/S1 and thought that was pain was similar.[76] Imaging studies showed only minimal endplate spurring.[77] On examination, Plaintiff was tender to palpation of the bilateral lumbar spine musculature between the L3 and S1 level, was neurovascularly intact, had no crepitus or bony abnormality, and had positive straight leg raise bilaterally.[78] Plaintiff's muscle relaxer was changed and she was given additional does of hydrocodone but advised to follow up with pain management.[79]

On August 5, 2022, Plaintiff presented to Dr. McVeigh complaining of chronic midline back pain.[80]  Dr. McVeigh ordered an MRI of the cervical and lumbar spine, noting chronic low back pain and neck pain which persisted despite six weeks of conservative treatment.[81]

---

[75] AR 1146.

[76] *Id.*

[77] AR 1151.

[78] AR 1152.

[79] *Id.*

[80] AR 1205.

[81] AR 1205-06.

On August 18, 2022, Plaintiff presented to Christian Garrido, PA, with complaints of neck and back pain.[82] On examination, the cervical paraspinal muscles were tender; range of motion was limited in the neck due to guarding; the lumbar paraspinals were tender and there was sacroiliac joint tenderness; range of motion of the lumbar spine was limited; straight leg raising was positive bilaterally, Faber's was positive bilaterally, there was mild bilateral weakness; and Plaintiff walked with a noticeable limp.[83] Plaintiff was assessed with ankylosing spondylitis of the lumbar region and cervicothoracic region; chronic pain syndrome; and lumbar radicular pain.[84] Plaintiff's hydrocodone was increased but she was advised that long-term opiate use was problematic.[85] PA Garrido agreed to take over pain medication management.[86]

On August 30, 2022, Dr. Statz performed a laparoscopic-assisted vaginal hysterectomy and bilateral salpingectomy, a left oophorectomy, a rectocele repair and a cystoscopy.[87] The pre-operative and post-operative diagnosis was pelvic pain,

---

[82] AR 1232.

[83] AR 1234.

[84] AR 1234-35.

[85] *Id.*

[86] AR 1235.

[87] AR 1201.

a history of ovarian cysts and rectocele.[88] On August 30, 2022, a pathology report indicated that the uterus, cervix, bilateral fallopian tubes and left ovary were found to contain benign tissue.[89]

On September 14, 2022, Plaintiff presented for follow-up with Kate Statz, DO, two weeks after having undergone a bilateral salpingectomy, left oophorectomy for pelvic pain and reported significant pain with nausea and vomiting.[90] She was prescribed additional pain medication.[91] At a follow-up visit on September 26, 2022, it was notes that Plaintiff was feeling much better, but her pain was not well-controlled.[92]

On October 12, 2022, Plaintiff presented to Jesus Rendon, PA, of Christian Garrido's office, for a follow-up visit for lumbar pain.[93] PA Rendon noted that Plaintiff reported feeling restless, anxious, and depressed and had difficulty sleeping.[94] On examination, the cervical paraspinal muscles were tender; range of motion was limited in the neck due to guarding; the lumbar paraspinals were

---

[88] *Id.*

[89] AR 1199.

[90] AR 1195.

[91] *Id.*

[92] AR 1197.

[93] AR 1223.

[94] AR 1224.

tender and there was sacroiliac joint tenderness; range of motion of the lumbar spine was limited; straight leg raising was positive bilaterally, Faber's was positive bilaterally, there was mild bilateral weakness; and Plaintiff walked with a noticeable limp.[95] Plaintiff was assessed with ankylosing spondylitis of the lumbar region and cervicothoracic region; chronic pain syndrome; lumbar radicular pain; and a history of failed treatment with duloxetine, gabapentin, Lyrica, Cymbalta, Cybella, Butrans, lidocaine, and oxycodone.[96] Plaintiff's prescription for hydrocodone-acetaminophen was refilled, and she was counseled on safety risks for the medication.[97]

On November 9, 2022, Plaintiff presented to Jesus Rendon, PA, for a follow-up visit for lumbar pain.[98] PA Rendon noted that a July 2022 image of the cervical spine showed mild C5-6 discogenic spondylosis; July 2022 imaging of the thoracic spine showed minimal discogenic spondylosis; a July 2022 x-ray of the lumbar spine showed minimal endplate spurring at L5/S1, and an April 2022 MRI of the pelvis showed what might be an ovarian cyst.[99] Plaintiff was assessed with ankylosing spondylitis of the lumbar region and cervicothoracic region; chronic

---

[95] AR 1224-1225.

[96] AR 1220-1221.

[97] AR 1225.

[98] AR 1219.

[99] *Id.*

pain syndrome; lumbar radicular pain; and a history of failed treatment with duloxetine, gabapentin, Lyrica, Cymbalta, Cybella, Butrans, lidocaine, and oxycodone.[100] Plaintiff's prescription for hydrocodone-acetaminophen was refilled, and she was counseled on safety risks for the medication.[101]

4.    <u>Analysis</u>

The later submitted records clearly reflect that as of March 31, 2022, Dr. McVeigh diagnosed Plaintiff with non-radiographic ankylosing spondylitis of the lumbosacral region and high-risk medication use and found that Plaintiff was HLA-B27+ and met the criteria for axial spondylarthritis.[102] In March 2022, Plaintiff was diagnosed by her rheumatologist with ankylosing spondylitis on the basis of an objective positive test for HLA-B27.

It was the statement of Dr. Bower that she would not and did not consider the effects or limitations of ankylosing spondylitis because it had not been diagnosed by a rheumatologist.[103] This was clearly error on Dr. Bower's part.

Based upon the record, the Court concludes that there is a significance to the fact that Plaintiff was diagnosed with ankylosing spondylitis. It was following that diagnosis that Plaintiff was accepted by a pain management center for treatment

---

[100] AR 1220-21.

[101] AR 1221.

[102] AR 1028, 1029.

[103] AR 100.

1    with narcotic medication and accepted for treatment by her primary physician, Dr.

2    Matelich.[104]  Prior to that diagnosis Plaintiff reported that she had been denied

3    treatment by pain management doctors, who thought "her pain was in her head."[105]

4          Subsequent to Plaintiff's diagnosis she was prescribed powerful narcotic

5    pain medication, which indicates that physicians found her condition to be more

6    severe than formerly believed.  Additionally, emergency room treatment records

7    indicate that she had positive objective findings which included spasm, tenderness

8    to palpation and positive straight leg raising.[106]  Indeed, the ALJ acknowledged

9    that the later submitted records established that there was a greater level of

10    limitation than the records reviewed by Dr. Bower or the state agency

11    evaluators.[107]

12          While it appears that the ALJ attempted to obtain supplemental medical

13    interrogatories from Dr. Bower prior to the supplemental hearing it appears that

14    Dr. Bower did not review Exhibits 20F through 23F, and it is clear that she did not

15    review exhibits 25F through 33F.

16          In the absence of medical expert opinions regarding the effects of Plaintiff's

17    ankylosing spondylitis, which the medical records indicate to be a complex and

18    _____

19    [104] AR 1071, 1166.

20    [105] AR 1055.

21    [106] AR 1152.

22    [107] AR 28-29.

23

1    serious condition, the ALJ made her own non-expert determination as to the

2    limitations that condition imposed.  There is nothing in the record which would

3    indicate that the ALJ was qualified to do so.

4        5.    Summary

5        On this record, without a proper medical opinion, the Court "cannot conclude

6    that the ALJ's decision was based on substantial evidence."[108]  The Court remands

7    with the direction that the case be fully developed and that an opinion be obtained

8    from a medical expert regarding the limitations caused by Plaintiff's conditions.

9    **B.    Symptom Reports: Plaintiff establishes consequential error.**

10        Plaintiff argues the ALJ failed to provide valid reasons for discounting

11    symptom reports and testimony that her impairments of fibromyalgia and

12    ankylosing spondylitis made it difficult for her to engage in any physical activity.

13    The ALJ offered several reasons for discounting Plaintiff's symptom reports—each

14    reason is addressed below.

15        1.    Standard

16        The ALJ must identify what symptom claims are being discounted and

17    clearly and convincingly explain the rationale for discounting the symptoms with

18    supporting citation to evidence.[109] This requires the ALJ to "show his [or her] work"

19

20    [108] *Id.*

21    [109] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). Factors to be considered

22    by the ALJ when evaluating the intensity, persistence, and limiting effects of a

23

and provide a "rationale . . . clear enough that it has the power to convince" the reviewing court.[110]

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[111] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing

_____

claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Soc. Sec. Rlg. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

[110] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (alteration added).

[111] *Molina*, 674 F.3d at 1112.

reasons' for the rejection."[112] General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims.[113] "The clear and convincing standard is the most demanding required in Social Security cases."[114] Therefore, if an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's symptoms, the corresponding limitations must be included in the RFC.[115]

2.   <u>Plaintiff's Testimony</u>

On May 19, 2022, Plaintiff appeared by telephone with her attorney to testify before ALJ Lori Freund.[116] She testified that she had not worked since the

---

[112] *Ghanim* 763 F.3d at 1163(quoting *Lingenfelter*, 504 F.3d at 1036).

[113] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims)).

[114] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[115] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

[116] AR 85-117.

onset date and was surviving on her husband's income.[117]  She said that she

receives food stamps and had received assistance twice in the last year in paying

her rent.[118] Plaintiff stated that in 2019 she earned $10,000 working part-time for

Great Clips cutting hair but that she left the job because her muscles were

cramping, she could not stand, she was anxious, and she was dropping things.[119]

She said that she had to take frequent breaks but her boss accommodated her and

that it got to a point that she could only stand for long enough to do one haircut.[120]

She said that she was not able to complete even one cut without crying with pain

and she left in January 2020.[121] She said that she did not stop working for covid-

related reasons.[122]

Plaintiff said that she spent most of 2020, 2021, and 2022 in bed or on the

couch incapacitated and that situations did not allow her to sit up or to drive.[123]

She said that she drives at times but has problems because her legs cramp and her

---

[117] AR 101-102.

[118] AR 102.

[119] *Id.*

[120] AR 102-103.

[121] AR 103.

[122] *Id.*

[123] AR 104.

arms have trouble holding the wheel.[124] She said that she told her doctors about her difficulty driving but they have not limited her driving. [125] She said she receives mental health treatment and takes medication for anxiety in addition to the hydrocodone she takes for pain.[126] She said she sees LMHC Mark Senzel and had been seeing him since February 2021, a year after she stopped working.[127]

Plaintiff said that before being diagnosed with ankylosing spondylitis she tried a number of medications for fibromyalgia which made her mental and physical conditions worse.[128] She said that she was diagnosed with ankylosing spondylitis by her rheumatologist Dr. McVeigh.[129] She stated that she would start Remicade infusions after her hysterectomy.[130] She said that the diagnosis was made on March 29, 2022, after her blood test for HLA-B27 was confirmed

---

[124] *Id.*

[125] AR 105.

[126] *Id.*

[127] *Id.*

[128] AR 106.

[129] *Id.*

[130] *Id.*

positive.[131] Plaintiff said that treatment was on hold because she had cysts on her left ovary and fibroids on the outer part of her uterus.[132]

Plaintiff said she also has vitamin deficiencies and gout and that she takes allopurinol for the gout but also used marijuana edibles to take the edge off her pain prior to getting prescribed hydrocodone.[133] She said she is treated at Lynx Pain Clinic and that she was off hydrocodone for a year before being prescribed it.[134] Plaintiff said that in 2005 she had injections and had a bad reaction to them and has not had them since.[135] She also had a Toradol injection in 2015 and it increased her pain.[136] Plaintiff said that she did not drink alcohol, had not been incarcerated, and had not served in the military.[137] She said that since 2020 she had tried several medications and they gave her gastrointestinal issues or mental health issues as a side effect.[138] She said that five pounds is the most she can carry and that she can only stand for ten minutes because she will almost pass out if she

---

[131] AR 107.

[132] *Id.*

[133] AR 108-09.

[134] AR 109.

[135] AR 110.

[136] *Id.*

[137] *Id.*

[138] AR 111.

stands too long and said she needs to recline until she is tested to see if she has positional orthostatic tachycardia (POTS).[139] She said that her legs get shaky, her back hurts, and she cannot cook a full meal.[140] She said that she has numbness and tingling in her hands and will drop things and that this is why she could not hold the clippers when she was cutting hair.[141]

Plaintiff said her husband has to give her reminders to take her medication.[142]  She said she has difficulty finding words and her husband has to complete her sentences.[143] Plaintiff said that she was told by her past medical providers that her symptoms were in her head because they could not diagnose her properly.[144] Plaintiff said she uses a shower chair and a walker and used a wheelchair the year prior that she borrowed from her stepmother.[145]  She said she cannot do chores because she cannot complete them and that when she tries she is "laid out for the rest of the day."[146]  Plaintiff said she has mostly bad days and that

---

[139] *Id.*

[140] *Id.*

[141] AR 112.

[142] AR 113.

[143] *Id.*

[144] AR 113-114.

[145] AR 114.

[146] *Id.*

on a good day she will take a short walk with her husband and children but has to take a break after.[147] She said that she reclines a lot during the day but can't sleep and that marijuana is the only thing that helps her sleep.[148] She said that her children were going to be 3 and 11 soon and that she recently had a proper diagnosis and hoped it would improve her quality of life.[149]

On December 5, 2022, Plaintiff and her attorney appeared at a supplemental telephone hearing before ALJ Freund.[150] She said she had not worked since the first hearing in May 2022 and had received only food stamps and Medicaid.[151] She said that there was a new diagnosis of ankylosing spondylitis.[152] She said she had an ER visit in July because she could not walk due to severe back pain.[153] She said she was given pain medication but nothing more could be done until her hysterectomy was performed on August 30, 2022.[154] She said that since the surgery she had a series of infections: a post-surgical infection, an upper

---

[147] AR 114-15.

[148] AR 115.

[149] *Id.*

[150] AR 118-60.

[151] AR 125-26.

[152] AR 126.

[153] *Id.*

[154] AR 127.

respiratory infection, a sinus infection, bronchitis, and the flu.[155] She said that her

doctor had ordered an MRI of the neck, back, right arm, and shoulder but she had

not been able to get them.[156] Plaintiff said she was getting pain management and

taking four hydrocodone a day with hydroxyzine and was also taking muscle

relaxers prescribed by her rheumatologist.[157] She said that about three nights a

week she takes marijuana edibles.[158]

Plaintiff said that because of her infections she had not yet started taking

Remicade.[159] She said that she gets drowsy from the muscle relaxers and itchy

from hydrocodone.[160] She said she wears pain patches at night and rarely also

during the day.[161] She said that her condition was worse since the prior hearing

and that she cannot stand to make dinner or stir food.[162] She said that her right

arm had been on the verge of carpal tunnel several years early and now was so bad

---

[155] *Id.*

[156] *Id.*

[157] AR 128.

[158] AR 129.

[159] AR 130.

[160] *Id.*

[161] AR 130-131.

[162] AR 131.

that she cried when she did any chore.[163] Her husband and children now do chores and she struggles even to hold a phone.[164] She said that recently she is confined to her bed or couch and no longer goes out to shop.[165] She said she no longer drives and that lying down or reclining is her only comfortable position.[166] She said that she has to have her legs elevated and to use a THC rub, compression socks, and a back wrap.[167] She said she also takes hot showers and uses foot inserts.[168]

Plaintiff said her fibromyalgia caused other symptoms such as heart palpitations, fatigue, weakness, and said that she gets faint when she stands long and was supposed to be tested for POTS but there is no testing site near her.[169] She said that she cannot focus for more than five minutes and that when she has flare-ups in the fall she has constant muscle and spine pain, fatigue, and brain fog.[170] She said he used to have longer between flare-ups and now gets them more

---

[163] AR 132.

[164] *Id.*

[165] *Id.*

[166] AR 133.

[167] *Id.*

[168] AR 133-34.

[169] AR 134.

[170] AR 135.

often.[171] She said she used to be able to function normally in the spring and summer but that over the last ten years it has gotten worse each year but that this year she had less than a month of time between flare-ups.[172]

Plaintiff said there is a big difference between her function in 2020 and her function at the time of the hearing.[173] She said that her condition gets worse every month and that in January 2020 she was already down to working 17 hours a week and left after she could not complete a haircut due to pain.[174] She said that in the summer of 2020 she was able to shop and was able to cook a meal and could drive to her doctor's office.[175]

### 3.   The ALJ's Findings

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her conditions to be only partially consistent with the evidence for two reasons.[176] She states that the first reason was that Plaintiff's allegations were inconsistent with the objective medical evidence.[177] The ALJ

---

[171] *Id.*

[172] AR 136.

[173] AR 138.

[174] *Id.*

[175] AR 139.

[176] AR 25.

[177] *Id.*

articulated:

> The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms. For example, the claimant reported relief with steroids, narcotic medication, and muscle relaxers (B4F/8; B9F/5; B29F/2). She reported improvement in her mental symptoms with Celexa (B4F/21; B29F/4). The claimant's physical and mental examinations demonstrate greater functioning than the claimant alleges. For example, her physical examinations document decreased range of motion in the neck and mild tenderness in the neck and low back (B3F/7-8, 12-13, 17, 22; B4F/7, 23; B19F/1). However, examinations routinely noted normal strength and tone in the upper and lower extremities (B3F/7-8, 13, 18, 22; B4F/7, 23, 40).[178]

The ALJ went on to state further:

> The second reason the undersigned finds the claimant's allegations not entirely consistent with the evidence is the claimant's many reportedly intact activities of daily living. The claimant has described daily activities, both in writing and at the hearing, that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. For example, throughout the record, the claimant reported engaging in activities such as homeschooling her son, doing hair extensions for a friend, selling adult products, riding a four-wheeler, making candles, cleaning the house, and doing laundry (B7F/8, 12, 26). She also described taking the kids to the park, hosting Thanksgiving, and caring for pets (B7F/33; B11F/3).[179]

4.    Relevant Medical Records

The Court hereby incorporates and refers to the relevant medical records summarized above in its analysis of the prior issue.

---

[178] *Id.*

[179] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

5.    <u>Analysis</u>

The Court will address the reasons given by the ALJ to find Plaintiff's subjective complaints less than credible.

    a.    <u>*The ALJ's reasoning that Plaintiff's allegations are inconsistent with the medical record.*</u>

As is noted above, as of March 31, 2022, Plaintiff was diagnosed with a serious condition for which additional limitations must be considered. The fact that those limitations are unknown cast doubt upon what extent, if any, Plaintiff's allegations are inconsistent with the objective medical record. The Court will, however, address the ALJ's reasoning that Plaintiff's treatment is conservative and that her symptoms are relatively well-controlled with medication.

First, the Court finds that the record does not support the ALJ's reasoning that Plaintiff's treatment is conservative in nature. Plaintiff is treated at a pain management center and receives a powerful narcotic medication which she takes four times a day.[180] Both the pain management clinic treating Plaintiff and her rheumatologist have stated that Plaintiff's use of opiates long-term would be both a high-risk option and problematic.[181] As a condition of the use of her narcotic pain medication, Plaintiff was required to have Narcan in case of overdose and to be

_____

[180] AR 1234-35.

[181] AR 1235, 1028.

instructed as to its proper use.[182]  It was the express statement of PA Garrido that Plaintiff's use of narcotic pain medication was problematic in the long term that he would be continually seeking an end strategy to find an effective non-narcotic medication or treatment to replace it.[183]

Moreover, there is evidence in the record that on at least two occasions Plaintiff experienced breakthrough pain despite the narcotic medication and required additional medication during a flare-up of her condition.[184]

Additionally, the ALJ failed to consider that Plaintiff's prescription for Remicade, an autoimmune blocker, was not wholly a conservative measure and that Plaintiff was required to undergo vaccinations prior to starting on the drug.[185] Similar to long-term use of opiates, long-term use of immune suppressors is discouraged by health providers due to the serious risk of infections, malignancies, and tuberculosis.[186]

---

[182] AR 1075.

[183] *Id*.

[184] AR 1152, 1234.

[185] AR 1028.

[186] National Institutes of Health, Risk of Adverse Events After Anti-TNF Treatment for Inflammatory Rheumatological Disease. A Meta-Analysis, www.nih.gov, (last seen March 21, 2024)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

b.    *The ALJ's consideration of Plaintiff's daily activities*

Plaintiff argues that the ALJ took Plaintiff's daily activities out of context when considering that they were inconsistent with allegations of total disability. The Court agrees that the ALJ has not considered the record as a whole when considering the activities cited by the ALJ.  Initially, the Court concludes that the ALJ erred in finding that Plaintiff's homeschooling of her son was an indication of greater physical ability when the record showed that she homeschooled her son in some proximity to the Covid-19 pandemic because of masking issues present at that time, that she did not do so voluntarily, and that she complained to her medical providers that she was struggling to do so.[187]

Notably, the activities which the ALJ cited were performed in 2020 and 2021, prior to the change in Plaintiff's condition which took place in late 2021 and early 2022.  These activities cannot reasonably be used to evaluate Plaintiff's later subjective allegations.[188]

6.    Summary

Because the ALJ did not give good reasons for discounting Plaintiff's symptom reports, a remand is warranted.  To ensure Plaintiff has a fair hearing on

---

[187] AR 687, 694.

[188] *Id.*

DISPOSITIVE ORDER - 37

1   remand, the Court finds it prudent to direct that the Social Security

2   Administrative assign this matter to a different ALJ.[189]

3   **C.    Witness Testimony: The Court Finds the Issue Moot**

4           Plaintiff argues the ALJ failed to properly assess the statement of her

5   husband, Jason Schill.  As discussed above, the ALJ failed to fully and fairly

6   develop the record as to Plaintiff's ankylosing spondylitis, and failed to give valid

7   reasons for discounting Plaintiff's reported symptoms. Because the ALJ will be

8   require to reevaluate the medical evidence and all testimony on remand, the Court

9   finds this issue to be moot.

10  **D.    Remand for Further Proceedings**

11          Plaintiff submits a remand for payment of benefits is warranted. The

12  decision whether to remand a case for additional evidence, or simply to award

13  benefits, is within the discretion of the court."[190] When the court reverses an ALJ's

14  decision for error, the court "ordinarily must remand to the agency for further

15  proceedings."[191]

16

17

18  _____

19  [189] *See* 20 C.F.R. § 404.940; *Reed v. Massanari*, 270 F.3d 838, 845 (9th Cir. 2001).

20  [190] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*,
    761 F.2d 530 (9th Cir. 1985)).

21  [191] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595

22  ("[T]he proper course, except in rare circumstances, is to remand to the agency for

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## IV.    Conclusion

Plaintiff establishes the ALJ erred. On remand, the ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 12**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 9th day of April, 2024.

_Edward F. Shea_
_____
EDWARD F. SHEA
Senior United States District Judge

_____

additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).